**In re Patricia S. KYLLONEN, Debtor.**

No. 00–44413.

United States Bankruptcy Court, D. Minnesota.

June 22, 2001.

Barbara J. May, Arden Hills, MN, for Debtor.

Julia A. Christians, Minneapolis, MN, trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER LIMITING CLAIM TO EXEMPTION

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on before the undersigned on the Trustee's Objection to Claimed Exempt Property.[1] Based on the files, record, and evidence produced, as well as the court's physical view of the property,[2] the court makes the following:

1. The Trustee originally objected to both a homestead exemption claim and Debtor's retirement funds exemption claim. The Trustee has not pursued the latter objection, and I am assuming it has been mooted.

2. At the initial hearing on this matter I suggested that, if the parties wished, I would visit

## FINDINGS OF FACT

Debtor Patricia Kyllonen ("Debtor") lives with her husband, David ("David"), and two daughters at 21852 Fillmore St. N.E., Cedar, Minnesota. Cedar is situated within the City of East Bethel, Minnesota. In this bankruptcy case, Debtor claims her home and ten acres of land on which it is located as exempt. The Trustee asserts that Debtor is entitled to exempt a homestead of no more than one-half of an acre of land in area and a value of no more than $200,000.

### 1. *The Property*

Debtor's home is located on an unplatted lot of approximately five acres ("the front lot"). The front lot, and the home and pole barn located on it, have an estimated value of approximately $350,000. The front lot is zoned residential and is considered rural/residential under the City of East Bethel's Comprehensive Plan ("Comprehensive Plan"). Debtor owns this property in her own name. For property tax purposes, Debtor and her spouse claim this front lot as their homestead. The home is very attractive, large, and upscale. There is a $90,000 mortgage of record on the property. Debtor purchased the land from her parents in 1974 and, after Debtor married David in 1980, they built the home there. The front lot is rectangular in shape, with its longer sides extending due east and west. The easternmost side of the rectangle and the westernmost side of the rectangle run due north and south.

There is a second lot of approximately five acres in area ("the back lot"). This lot is vacant. There is no mortgage of record against the back lot, which is valued at approximately $45,000. The back lot is also rectangular in shape. The easternmost side of the back lot is coextensive with the western side of the front lot. The northern and southern sides of both lots are a straight line. The two lots thus form a somewhat perfect rectangle of ten acres. Debtor and David purchased the back lot in both their names in 1988 (or 1991). For property tax purposes, the back lot is non-homestead property. The back lot is unplatted, zoned residential, and considered rural/residential under the Comprehensive Plan.[3] At its southeastern corner the back lot abuts a road in the Cedar Trails Subdivision. The back lot is buildable.

The front and back lots are perfectly contiguous, the contiguous line basically bisecting the ten-acre rectangle. Both lots are heavily wooded with mature oak trees and other hardwoods. They are of generally rolling topography, with a more marshy area or creek forming the far west lot line of the back lot. Both the front lot and back lot used to be part of Debtor's parents' family farm.

The front lot is bounded on the east side by Fillmore Street. Across Fillmore

the site with them in order to better understand the evidence to be presented at an evidentiary hearing. The parties agreed. On March 21, 2001, I met the Trustee and Debtor's counsel at the site. Together we inspected the property, as well as the surrounding area. The viewing turned out to be enormously helpful to me, as well, I think, for counsel on both sides, in efficiently dealing with the issues presented.

**3.** After the evidentiary hearing, confusion arose about whether the back lot was platted or unplatted. An Exhibit attached to the Trustee's Memorandum in Support of Motion Objecting to Claimed Exempt Property filed January 23, 2001 contains a legal description of the back lot for tax assessment purposes which seems to indicate that the back lot is platted as part of the Cedar Trails Subdivision. However, as clarified by the parties after contacting the tax assessor's office, that legal description is actually intended to exclude the unplatted back lot from the neighboring platted subdivision.

Street are, looking east from Debtor's home, several lots which are zoned commercial. There is one commercial building on these lots which is no longer in use. The building formerly housed Debtor's late father's commercial retail business "The Sylvester Companies" ("The Sylvester Companies"). This business apparently sold parts, equipment, and other materials on an outlet basis to farmers. The several contiguous lots on Fillmore Street which basically face the front (eastern) boundary of Debtor's property are now owned by the estate of Debtor's father. At the time of the filing, or shortly thereafter, they were rezoned from commercial to rural/residential. There is a stand of trees, running north and south on the far eastern side of these properties. Immediately further to the east is rural/residential property stretching approximately one-half mile to Highway 65. There are at least three homes in this space. The residents of the homes in this area have full-time outside jobs, but one or more of them grows farm crops, apparently hay, on the side.

Immediately to the north of Debtor's two lots is what the City of East Bethel describes as a five-acre homestead. This property has a home on it, but no farm type buildings, at least none observed during the property viewing or mentioned at the evidentiary hearing. However, for many years the owners have raised hay, and last season harvested three hay crops.

Immediately to the west of Debtor's property is the Cedar Trails Subdivision which includes at least a dozen or more developed residential lots. Immediately to the south are additional parts of the Cedar Trails Subdivision, East Cedar Trails Subdivision, and Cedar Trails Second Addition Subdivision, containing at least twenty-five additional platted homesites, many of which have been built on. All of these subdivisions are zoned rural/residential. A portion of the Cedar Trails Subdivision has not yet been subdivided and lies vacant ready for housing development. All of the Cedar Trails Subdivisions are themselves essentially surrounded by other subdivisions. East Bethel Community Elementary School is directly to the south.

The Cedar Trails acreage was formerly owned by Debtor's parents, who farmed it. To the extent any part of the subdivisions have not been sold, they are now owned by the estate of Debtor's father. Debtor's brothers, as personal representatives, have been charged with administering the estate. Because of generation skipping, Debtor will not participate in the administration of or receive any distributions from the estate, and she testified that she has no role in decisions made about the property. The former family farm has not been farmed for years, although some of it was in production until around three years ago. Even while it was a farm, Debtor's father also ran The Sylvester Companies, a retail business, on the farm.

The homes in the Cedar Trails Subdivision and others surrounding it are large, beautiful, clearly expensive, and upscale. Other lots, which are, by city ordinance, all at least two and one-half acres, are not yet developed but are ready for development. Thus, in essence, all of the land to the west and south of Debtor's property for several miles is platted suburban residential.

### 2. East Bethel

The City of East Bethel is one of several townships and villages within commuting distance from the Twin Cities. Precisely, Debtor's home is thirty-one miles north of downtown Minneapolis and one-half mile or so west of Highway 65, a main commuter road into the Twin Cities. East Bethel is almost exclusively rural/residential. Homes in East Bethel do not have sewer and water hookup available, as a conse-

quence of which no home can be built on a lot less than two and one-half acres in area. Debtor's home is no exception, nor are the upscale homes existing and being built or to be built in the residential developments to the south and west of Debtor's property.

Twenty-two percent of the land in East Bethel is vacant/rural. Fourteen percent is rural/residential. Rural/residential, for purposes of city planning, apparently means suitable for homes, but only if the homes are built on lots at least two and one-half acres in area. There is virtually no multiple family residential development, no commercial development other than that found in a strip along Highway 65, and no industrial development in East Bethel. East Bethel is a "bedroom community" filled with homes, many of them upscale and on large lots. Many of these homes, including Debtor's, are concentrated near Highway 65. The amount of agricultural land in East Bethel is sparse, as the land is poor and not well-drained. In Debtor's immediate vicinity, there are no barns, farm outbuildings, or any signs of true family farming operations. Based on what the court saw at the property viewing, as well as heard during an evidentiary hearing, it is clear that to the extent people in the area do some farming, they are not typical family farmers. Rather, they work the land or keep horses for non-economic reasons.

The Comprehensive Plan describes Debtor's front lot as rural/residential, the back lot as agricultural/vacant, the neighboring property to the north as a five-acre homestead, the property to the east as commercial, and the property to the south and west as rural/residential, with some vacant land yet to be developed. What is clear from the Comprehensive Plan is that East Bethel is now and plans to stay a rural community that caters to residents

who want homes on large lots within commuting distance of the Twin Cities.

The Comprehensive Plan, for example, states: "East Bethel is a rural community with housing that predominantly consists of large-lot family homes. Factors influencing the availability of housing choices include the predominance of wetland areas, the lack of central wastewater treatment systems, and the land requirement for individual sewage treatment systems. In addition there is a weak market for multiple family housing due to limited local employment opportunities, limited services, and distance from urban amenities." It goes on to state: "The Metropolitan Council has designated the entire City of East Bethel as part of the Permanent Rural area, as East Bethel falls outside areas needed for urban development through the year 2040. Its designation as 'Rural' versus 'Agricultural' is due to existing development patterns and the presence of sandy wet soils that make agriculture less productive than in other parts of the region. The City supports this designation as it has a desirable rural atmosphere that the community intends to protect. The policy of East Bethel is to permit only residential densities that maintain the permanent rural character of the City."

The City of East Bethel's Growth Management Plan to 2020 indicates that all of the area encompassing Debtor's property, and all of the land to the east, north, west, and south, will be rural/residential. What little agricultural area will be allowed in East Bethel will be miles away, most of it far to the east of Debtor's property. Finally, the Comprehensive Plan makes clear that agricultural development, of any sort, is, for the most part, frowned upon because it conflicts from a planning perspective with the development of rural/residential housing and because most of the land in the township is ill-suited to agriculture.

### 3. The History

Debtor grew up on her parents' family farm which has now been platted into the Cedar Trails Subdivision. They raised chickens, pigs, cows, and other farm animals. They may have grown crops, although that is not clear. Debtor bought the front lot from her father in 1974 before she married David. She says she purchased the property because she knew she "always wanted to return to farming." She married David in 1980. Apparently they built their house and a pole barn on the front parcel soon thereafter. They purchased the back lot from her father in 1988 (or 1991) because, she says, they were thinking of continuing the family tradition.

It appears that, while Debtor and David occupied the front lot as their homestead in the early 1980s, they did no farming of any sort until 1990 or 1991. Debtor and her spouse tried raising different types of mushrooms in 1991, but their crops failed. They got serious about cultivating ginseng five years ago.

### 4. The Ginseng Operation

In 1996, Debtor and her spouse cleared one-tenth of an acre of land on the front lot and planted ginseng seeds which they bought from a distributor in Wisconsin. Each year since then they have cleared and planted another one-tenth of an acre of land.

Ginseng is a small herbal plant harvested for its roots. It has been used extensively in Eastern cultures for centuries. Its main market is still in Asia. It grows wild, but can also be cultivated. Most ginseng is cultivated on flat farmland on a high volume basis. Ginseng cultivated in this manner requires much capital expenditure and equipment and machinery, including artificial canopies which are used to shade the plants as they grow. According to Debtor and her spouse, this type of cultivation produces an inferior product.

The other form of cultivation, wood-cultivated, is more natural. To wood-cultivate ginseng, you need land that is well-drained, has the proper pH content, and is filled with enough mature hardwood trees (preferably oak) to form a shade canopy over the plants. This type of ginseng, according to Debtor and her spouse, is much more valuable, at least at current market rates, which fluctuate.

Debtor and her spouse cultivate this latter type of ginseng. They have no formal training in doing so. Instead, Debtor's spouse learned what he knows about ginseng generally and wood-cultivated ginseng specifically from a book he has read, other written sources he has found, and the Internet.

The longer one grows ginseng before harvesting the root, the better. The earliest one can harvest the root is about five to seven years after it is first planted. Accordingly, Debtor and her spouse have as yet had no income from their ginseng efforts and do not expect any for another two to three years, at the earliest. Once a ginseng plant is harvested, the land cannot be used for ginseng farming again for decades and must lie fallow.

Typically, wood-cultivated ginseng is planted in the fall. Before planting, the plot must be cleared of underbrush and dead or dying trees, leaving only the healthy mature hardwoods overhead to furnish the canopy for the plants as they grow. There is nothing to do in the winter, except when there is no snow cover and hay must be put down.[4] Once the

---

**4.** This is Minnesota. The court takes judicial notice of the fact that a lack of winter snow cover is an aberration.

plants begin to come up the next spring; the plot must be weeded, which is a time-consuming process. Also, once the plants are about four years old, berry-like seeds are taken from the plants and put in the ground to stratify in late summer or early fall.

Other than clearing (which must be done only once), planting, and weeding, nothing else is involved in a wood-cultivated ginseng operation. A wood-cultivated ginseng operation does not require heavy equipment. Indeed, Debtor and her spouse have only a small tractor, an underbrush cutter attachment, and a small bobcat which they store in the pole barn. They purchased this equipment for less than $5,000. They do not use fertilizers or pesticides.

Neither Debtor nor David could identify any other ginseng "farming" operations in Minnesota. Apparently there is quite a bit of cultivated ginseng grown in Eastern Wisconsin, but there is no evidence of wood-cultivated ginseng operations anywhere near here. There is a seed distributor in Wisconsin from whom Debtor and David buy seeds and to whom they expect to eventually sell their crop.

### 5. The Family Economics

Debtor inherited or purchased The Sylvester Companies and worked in this business full-time during at least all of the 1990s until the business failed in 1999. That business failure precipitated the filing of her personal bankruptcy. After she lost The Sylvester Companies, Debtor eventually landed a job as a sportswear manager at Burlington Coat Factory, where she works a 40–hour week. Her only involvement in the ginseng operation is to spend some time on days off, early mornings, evenings, and weekends helping to clear and to pull weeds. She does not handle the books or records. It appears that she actually knows little about her husband's ginseng venture.

Neither David nor Debtor was forthcoming regarding what David has done or does do to earn money. Debtor testified that David was not working outside the home. This was technically correct, but seriously misleading. David testified as though he had never done and was not currently doing anything outside the home.

I had to piece the following together from their tax returns and information gleaned from court questioning:[5]

*1991:*[6] Debtor identified herself as an "executive." She had earned income of approximately $33,000 from Sylvester Fashion Outlet, Inc. David listed his occupation as a "farmer" with no reportable income. The couple deducted $5,867 in farm losses. Those losses almost certainly tied to the failed mushroom venture. They also deducted business losses apparently connected with Debtor's ownership interest in The Sylvester Companies.

*1992:* Debtor listed herself as an "executive." She had earned income of $57,894

---

5. There were other such lapses in the case. Debtor's original schedules made no mention of the back lot, explained as counsel error. The schedules also made no mention of the tractor, bobcat, and underbrush cutter. Debtor explained that such equipment was not included because it was purchased with David's separate funds, an excuse which was not documented. In addition, there was a suggestion that Debtor purposely undervalued the homestead in her schedules.

6. Debtor testified that in each of the years 1991–1999 the Debtor had "farm losses," thus leaving the impression that the couple had farmed on this land. There was no cross-examination on this topic, but the tax returns themselves show how misleading this suggestion was.

from Sylvester Sales Company. David listed his occupation as "Electrical Design." He had $31,466 in earned income from electrical design contract work for two separate businesses. Debtor and her spouse took a business loss deduction of $4,521 for losses sustained in a "fish farming" operation and a business loss deduction of $126,868 on The Sylvester Companies. The fish farming operation was David's and had an address in Wisconsin. They did not file Schedule F reflecting any farm income or losses.

*1993:* Debtor continued to list herself as an "executive." Her W–2 showed earned income of $68,979 from Sylvester Sales Company. David listed his occupation as "Electrical Design" and he earned $3,847, again from two separate contracting or design businesses. The couple took a business loss deduction of $4,421 on David's Wisconsin fish farming operation and further business loss deductions on The Sylvester Companies. They did not file Schedule F reflecting any farm income or losses.

*1994:* Debtor listed herself as an "executive" and her spouse listed himself as "Electrical Design." Since W–2s were not provided for this year, the distribution of earned income between Debtor and her spouse is unclear. Their combined earned income was $96,033. They deducted $8,542 in business losses for "ginseng" with David as the proprietor. They did not file Schedule F reflecting any farming income or losses, however.

*1995:* Debtor listed herself as an "executive." Her W–2 shows that she had earned income of $75,194 from Sylvester Sales Company. David listed himself as in "Electrical Design," but he had no earned income that year. The couple deducted $6,535 in business losses for David's ginseng business and additional heavy business losses in The Sylvester Companies.

They did not file Schedule F reflecting any farm income or losses.

*1996:* Debtor listed herself as an "executive." Her W–2 shows that she had earned income from Sylvester Sales Company of $33,623. David listed himself as a "Farmer" and had no earned income. The couple deducted $5,867 in losses for the ginseng operations, this time filing a Schedule F, and business losses with The Sylvester Companies.

*1997:* Debtor listed herself as an "executive." She received $69,773 in income from Sylvester Fashion Outlet. David listed himself as a "farmer," but he had earned income paid to him by one of his electrical design customers of $8,164. The couple filed Schedule F which showed a farm loss of $7,148. Once again, The Sylvester Companies lost money and threw off business losses.

*1998:* Debtor continued to list herself as an "executive." She received $85,861 in income from The Sylvester Companies. David listed himself as a "farmer," but he had earned income of $12,045 from the same business he had done work for in 1997. They filed a Schedule F and took a farm loss of $6,128. The Sylvester Companies continued to throw off business losses.

*1999:* Both Debtor and her spouse listed themselves as in "Retail." Debtor earned wages of $11,219 from The Sylvester Companies. David earned wages of $19,735 from another company, which appears to be for electrical design work. The couple filed a Schedule F showing $2,498 in losses on David's ginseng operation. There were more business losses in The Sylvester Companies.

*2000:* Debtor and her spouse have not filed their 2000 tax return, but Debtor testified that she is employed full-time at Burlington Coat Factory as a sportswear

manager and, under questioning from the court, David testified that he worked for an outside company as an electrical designer full-time from April 2000 until March 2001, when he was "laid off."

Debtor testified that The Sylvester Companies was a business entity that her father originally owned and that she inherited or bought. She clearly has had full time work in those companies, or more recently at Burlington Coat Factory. No one explained the "fish farm," although from the evidence presented it appears that this was one of David's separate failed ventures. And the "fish farm" was not located on Debtor's Minnesota property. Neither Debtor nor David volunteered pertinent information on the issue of David's employment history. It is clear that he has been employed on and off at different companies around the Twin Cities as a consultant or independent contractor. Presumably when the job is done, he is no longer employed, but he does go, and always has gone, back to electrical design. He testified that he considers himself a ginseng farmer, and made no mention of this outside work until very specifically asked by the court itself. He further testified that he works about half and half throughout the year at ginseng farming, working 40 hours on his other job and 40 hours on ginseng. It was clear to this finder of fact that both Debtor and her spouse fervently believe that they are ginseng farmers at heart, that they love their land, and that they will shade their description of their financial and employment situations to protect it.

A ginseng plot of one-tenth of an acre in area consists of about 4,400 square feet. This is roughly double the size of this court's small vegetable garden. Stated differently, it is a plot 100 feet by 40 feet. While ginseng is labor intensive at times, it is difficult to believe that a family of four can be occupied at least 40 hours or more full-time farming such a plot, or even one that is four to five times that much. Once cleared, the land is cleared. The seeds are sown and stay in the ground for almost a decade without harvesting. Seeding such a small plot each year cannot possibly require full-time work in the fall, when presumably the weeds are down. And, even weeding, certainly after the ground is under control and the plants have begun to mature, can no doubt be time consuming but not all-consuming as Debtor and her spouse seemed to imply.

In five years of operation (1995–1999), this "farm" has thrown off nearly $28,000 in tax deductible losses, approximately $9,000 of which were paper losses in the form of depreciation. It has not paid wages and has had virtually none of the normal types of costs associated with agricultural production. Its total seed and supplies costs, in combination, have averaged about $1,700 per year. Its other major expense has been utilities (presumably to heat the pole barn or the house), which have ranged between $400 to $600 per year.

There is conflicting testimony in the record as to how much income one-tenth of an acre of ginseng (one year's crop grown to full bloom) will produce. Debtor testified it would produce fifteen pounds of ginseng, which at today's prices ($280 per pound) would produce $4,200 each year. David corrected her, saying that it would produce 10,000 pounds and throw off $280,000 the first year and that he was hoping and expecting to get that much. Neither witness, however, has experience in harvesting and selling ginseng. What they know is what they have read in books or learned on the Internet. The fact of the matter is that Debtor and her spouse probably have no idea how much the crop is likely to

bring in and probably did not care until this dispute came up.

## CONCLUSIONS OF LAW

Invoking the Minnesota homestead exemption statute, Debtor claimed her two contiguous five-acre parcels as exempt in her bankruptcy schedules. The Trustee objected to the claimed exemption, asserting that Debtor is entitled only to a one-half acre exemption up to $200,000.

■■■ A debtor may exempt from her bankruptcy estate certain property which is exempt under applicable state law on the petition filing date. *See* 11 U.S.C. § 522(b)(2)(A) (1994); *see also Peoples' State Bank v. Stenzel (In re Stenzel)*, 259 B.R. 141, 144 (8th Cir. BAP 2001). The court must look to the condition of the property on the date of the filing and none other.[7] The party objecting to the debtor's claimed exemption, the Trustee in this case, bears the burden of proving the debtor is not entitled to the exemption. *See In re Curry*, 160 B.R. 813, 817 (Bankr. D.Minn.1993).

■■ Section 510.01 of the Minnesota Statutes specifically provides:

The house owned and occupied by a debtor as the debtor's dwelling place, together with the land upon which it is situated to the amount hereinafter limited and defined, shall constitute the homestead of such debtor and the debtor's family, and be exempt from seizure or sale under legal process on account of any debt not lawfully charged thereon in writing, except such as are incurred for work or materials furnished in the construction, repair, or improvement of

such homestead, or for services performed by laborers or servants.

Minn.Stat. Ann. § 510.01 (West 2000). Section 510.02, in turn, defines the area limits of the homestead:

The homestead may include any quantity of land not exceeding 160 acres, and not included in the laid out or platted portion of any city. If the homestead is within the laid out or platted portion of a city, its area must not exceed one-half of an acre. The value of the homestead exemption, whether the exemption is claimed jointly or individually, may not exceed $200,000 or, if the homestead is used primarily for agricultural purposes, $500,000, exclusive of the limitations set forth in section 510.05.

Minn.Stat. Ann. § 510.02 (West 2000). The Minnesota homestead law is to be liberally construed. *See In re Haggerty*, 448 N.W.2d 363, 367 (Minn.1989) (citing *Eustice v. Jewison*, 413 N.W.2d 114, 119 (Minn.1987); *Ryan v. Colburn*, 185 Minn. 347, 241 N.W. 388, 389 (1932)). However, its interpretation "is not to be strained." *In re Stenzel*, 259 B.R. at 144 (citing *Ross v. Simser*, 193 Minn. 407, 258 N.W. 582, 583 (1935); *Vickery v. First Bank of La-Crosse*, 368 N.W.2d 758, 762 (Minn.Ct.App. 1985)).

■■ Generally speaking, "[e]xemption laws work in tandem with debt discharge to effectuate a debtor's fresh start." *In re Haggerty*, 448 N.W.2d at 367. "The intent of the homestead exemption is to secure a debtor's home against uncertainties and misfortunes of life and to preserve the home as a dwelling place for the debtor and his or her family." *In re Stenzel*, 259 B.R. at 146 (citing *In re Mueller*, 215 B.R. 1018, 1023 (8th Cir. BAP 1998)). Howev-

---

7. And that is what I have done. At trial Debtor's counsel appeared to suggest the Comprehensive Plan was inappropriate for use as evidence because it looked to the fu-

ture. Not true. It describes East Bethel and the area in and around Debtor's property as they stand today and brought considerable clarity to the situation.

er, the area limitations and other requirements ensure that the debtor does not unfairly retain assets. *See In re Haggerty*, 448 N.W.2d at 367–68 (citing, *inter alia*, Eisenberg, *Bankruptcy Law in Perspective*, 28 UCLA L.Rev. 953, 994 (1981)).

## A. *The Two Lots*

In her initial objection memorandum, the Trustee suggested that Debtor was not entitled to exempt the two five-acre parcels because, *inter alia*, they are wholly separate parcels. Debtor's house is located only on the front lot, and the front lot and back lot are unrelated in terms of ownership, time of purchase, and encumbrances. Based on Debtor's original schedules and testimony at the § 341 meeting, the Trustee's argument carried some merit. However, Debtor's amended schedules and the property viewing have since clarified the nature of the two parcels, making clear that, under the case law interpreting the relevant statutory language, the two parcels can be considered together.

■ The statute provides that a debtor may exempt the "house owned and occupied by a debtor as the debtor's dwelling place, together with the land upon which it is situated" within certain area limits. Minn.Stat. Ann. § 510.01 (West 2000). As a threshold matter, a "debtor must 'own and occupy' a home upon the land to qualify for a homestead exemption." *In re Stenzel*, 259 B.R. at 144. Under the statute, "occupancy," as recently interpreted, requires that the debtor have a "legal right to occupancy and possession of a parcel of real estate for which a homestead exemption is claimed." *In re Stenzel*, 259 B.R. at 145.

■ In this case, Debtor owns and occupies both the front lot and the back lot. She is the sole owner of the front lot on which the family house is located; she and her spouse jointly-own the back lot. In addition, Debtor has a legal right to, and in fact does, presently possess and use both the front lot and the back lot.

■ Having satisfied the ownership and occupancy requirements, the court must next consider whether the back lot falls within the "together with the land upon which [the house] is situated" language of the statute. *See* Minn.Stat. Ann. § 510.01 (West 2000). In *Michels v. Kozitza*, 610 N.W.2d 368, 372 (Minn.Ct. App.2000), the court rejected a farmer's argument that the homestead exemption statute protected a twenty-acre piece of property that was noncontiguous with the parcel on which his home was located. The court underscored: "The exemption specifically states that the home is exempt '*together with the land upon which it is situated*.' Michels concedes that the 20 acres in dispute is noncontiguous with the land on which his home is situated. Thus, we are compelled to conclude that although he may be able to 'homestead' the property for tax purposes under Minn.Stat. § 273.124, the homestead exemption from judgments and foreclosures does not apply to noncontiguous property." *Michels*, 610 N.W.2d at 372 (internal citations omitted and emphasis in original). In reaching its decision, the Minnesota Court of Appeals relied on older case law interpreting and applying the predecessor homestead exemption statute. That statute provided in relevant part that a debtor may exempt "any quantity of land not exceeding eighty acres, and the dwelling house thereon, and its appurtenances." *Michels*, 610 N.W.2d at 372 (citing *Brixius v. Reimringer*, 101 Minn. 347, 112 N.W. 273, 273 (1907)). The *Michels* court pointed out that in *Brixius*, the Minnesota Supreme Court made clear that the parcels " 'should be so connected that they can be used as

one tract'" and pointed out: "'The essential thing to constitute a quantity of land within the homestead law is that it shall be occupied and cultivated as one piece or parcel of land, on some part of which is located the residence.'" *Michels,* 610 N.W.2d at 372 (quoting *Brixius,* 112 N.W. at 273). In other words, "[t]he fact that the two parcels were contiguous, meaning joined at some point, was the essential fact." *Michels,* 610 N.W.2d at 371.

Other recent case law reinforces the conclusion the Minnesota Court of Appeals reached in *Michels. See, e.g., In re Priebe,* 69 B.R. 100, 103 (Bankr.D.Minn. 1987) (criticizing homestead exemption statute as outdated and arbitrary because it fails to recognize that modern-day farmers often farm non-contiguous parcels but nevertheless denying exemption for non-contiguous parcels based on statute's plain language); *Muscala v. Wirtjes,* 310 N.W.2d 696, 697–98 (Minn.1981) ("Minn. Stat. § 510.01 (1980) defines a homestead as the house 'owned and occupied by a debtor as a dwelling place,' together with a limited amount of surrounding land."); *In re Stenzel,* 259 B.R. at 146 (mentioning that two parcels must be contiguous and finding that debtor could not exempt two parcels because they were not contiguous nor did he possess ownership or occupancy rights to both parcels).

In addition, in *Dietz v. Becker,* 215 B.R. 585, 587 n. 3 (8th Cir. BAP 1998), the Eighth Circuit Bankruptcy Appellate Panel rejected the trustee's argument that the court should consider "only the house and not the 'incidental pastureland'" in its factual analysis of the character of the homestead as rural or urban. Citing early Minnesota case law, the Bankruptcy Appellate Panel stated: "Neither the statute nor the case law supports the trustee's assertion .... Indeed, the homestead ex-

emption found in section 510.01 provides that it incorporates up to 160 acres. In analyzing the entitlement to the homestead, we look to the entirety of the property claimed, not merely the house and the limited amount of land upon which it is situated." *Id.* at 587 n. 3 (citing *Stauning v. Crookston Mercantile Co.,* 134 Minn. 478, 159 N.W. 788 (1916); *Brixius v. Reimringer,* 101 Minn. 347, 112 N.W. 273 (1907)). *See generally Stauning v. Crookston Mercantile Co.,* 134 Minn. 478, 159 N.W. 788, 788 (1916) ("The only question for decision is whether the plaintiff is entitled to hold the entire lot as his homestead, or only the easterly 25 feet thereof, upon which the building in which he resides is located. This question is settled in plaintiff's favor by the prior decisions of this court." (internal citations omitted)); *Winland v. Holcomb,* 26 Minn. 286, 3 N.W. 341, 342 (1879) ("The court held the sale void, because of the homestead exemption, and laid down the rule in such case the entire lot, and not merely that part on which the building stands, is exempt, and that the part not covered by the dwelling may be devoted by the owner to any use which he may choose, without affecting the exemption.") (citing and discussing *Kelly v. Baker,* 10 Minn. 154, 1865 WL 945, at *1 (1865)).

Given the case law interpreting this statutory phrase, that Debtor's two parcels vary in ownership, encumbrances, and time of purchase is largely irrelevant. Because the front lot and back lot are contiguous, for purposes of interpreting § 510.01, they should be considered together, essentially as if they were one parcel. Therefore, I find that the back lot falls within the "together with the land upon which [the house on the front parcel] is situated" language of the exemption statute and that the two parcels can be treated together.

B. *Acreage Limitation and the Conclusively Rural or Conclusively Urban Two–Pronged Test*

 To determine the homestead amount to which Debtor is entitled in this case, the court must construe § 510.02 of the Minnesota Statutes. Section 510.02 provides that a debtor is entitled to exempt up to 160 acres of a homestead "not included in the laid out or platted portion of any city," or only one-half of an acre "[i]f the homestead is within the laid out or platted portion of a city." Minn.Stat. Ann. § 510.02 (West 2000). To apply this statute, the court must examine not only the nature of the particular land in question but also the character of the surrounding area:

> If, as a factual matter, the surrounding area is conclusively urban in character, the claimants are limited to the one-half acre permitted under section 510.01. If the surrounding area is conclusively rural, the claimants are permitted to exempt up to 160 acres. However, if the surrounding area is not conclusively rural or urban, a second factual determination must be made as to the character of the homestead itself.

*Dietz v. Becker (In re Becker)*, 215 B.R. 585, 587 (8th Cir. BAP 1998). *See generally National Bank v. Banholzer*, 69 Minn. 24, 71 N.W. 919, 920 (1897); *State ex rel. Chase v. Armson*, 135 Minn. 205, 160 N.W. 498 (1916); *In re De Griselles*, 185 Minn. 495, 241 N.W. 590 (1932); *Mead v. Marsh*, 74 Minn. 268, 77 N.W. 138 (1898).

 The threshold inquiry under either analysis is the character of the land surrounding Debtor's property. "Rural 'in its character'" means "when it is used for rural and agricultural purposes." *In re Becker*, 212 B.R. 322, 325 (Bankr.D.Minn. 1997) (citing *Kiewert v. Anderson*, 65 Minn. 491, 67 N.W. 1031, 1033 (1896)). On the other hand, the "smaller urban mea-

sure of the homestead exemption can be imposed on 'only ... that portion [of a city] which is laid out and platted for city or urban purposes, and not to land which is merely laid out for agricultural or rural purposes, or, in other words, merely subdivided into small farms or farm lots.'" *In re Becker*, 212 B.R. at 325 (quoting *Smith's Estate v. Schubert*, 51 Minn. 316, 53 N.W. 711, 712 (1892)). Put another way, rural property is property where the structures and buildings on the land are ancillary to the use of land itself as agricultural, whereas urban property is property for which the land is ancillary to the use of the buildings and houses. *See Smith's Estate*, 53 N.W. at 712 ("The size of the lots and the plan of the play conclusively show that they were designed for agricultural, and not urban, uses. It is true that they might be occupied for residences the same as a lot in the other part of the plat. But so can any farm, large or small; *but this would be but ancillary to the use of the land as a farm, while, in the case of a residence on an urban lot, the land is but ancillary to the convenient use of the dwelling.*" (emphasis added)); *see also In re De Griselles*, 185 Minn. 495, 241 N.W. 590, 591 (1932) (stating general principle developed in the case law regarding difference between "rural property where the buildings were ancillary to the use of the land and urban property where the land is ancillary to the use of the buildings") (citing *National Bank v. Banholzer*, 69 Minn. 24, 71 N.W. 919 (1897); *State ex rel Chase v. Armson*, 135 Minn. 205, 160 N.W. 498 (1916)).

 I would characterize the area surrounding Debtor's property as urban or, more accurately, suburban. The land surrounding Debtor's homestead is residential property characterized by very large lots occupied by people who have principal occupations off the land. Located to the

south and west are several suburban housing developments and a school; immediately east, commercially-zoned property which is about to be or has been turned into residential housing. The only exceptions to the suburban residential milieu are the neighbor to the north who resides on a five-acre homestead, all or part of which used to be a family farm, and grows hay, and a few neighbors closer to Highway 65 who, once again, are nonfarmers but do grow a few crops on the side. But for these neighbors, also, their use of the land to "farm" is incidental to their use of the land for a home site. "Farming," to the extent it occurs on any surrounding plots, is not the main use of the land; housing is. This is also true with respect to Debtor's homestead. The true nature of the area surrounding Debtor's property is that of a gathering of homeowners who can afford more land than the city or the inner ring suburbs provide, are willing to commute longer distances to obtain the privacy large acreage offers, and some of whom use their large acreage for sideline agricultural purposes. This is predominantly urban (or suburban), though country-like.

Of course, I must also consider the nature, character, and use of Debtor's homestead property itself. Though the back and fronts lot are contiguous, each has a slightly different character. Thus, I will analyze them both separately and as a unit. Analyzing the two lots separately, the back lot is conclusively urban: though unplatted and currently vacant, it lies within the city limits of East Bethel, abuts Cedar Trails Subdivision, and is buildable. While bordered to the north by a parcel of open land, the back lot basically sits in the midst of a housing development. But for its connection to the front lot, it would almost surely be sold and developed as an upscale residential homesite. Its highest and best use is obviously as an expensive housing site in an already-existing subdivision.

The front lot, though not platted, is also urban in nature. Debtor originally purchased the front lot to build a house. Indeed, the property has been used exclusively as a residence, except for 1991, when it housed the failed mushroom farming operations, and the last five years during which Debtor and her spouse have taken up wood-cultivated ginseng.

Alternatively, taken together, the two parcels are conclusively urban: the use of the land for small-scale ginseng operations is ancillary to its primary use as the situs of Debtor's large house. *See Smith's Estate*, 53 N.W. at 712.

■ At the evidentiary hearing, Debtor testified extensively about the fact that she has played no role in bringing the neighboring subdivisions and other characteristically-urban development to East Bethel. She maintains that because her lots are and always have been rural, she is entitled to the larger acreage exemption, notwithstanding the subsequent actions of her neighbors, developers, and city planners. Debtor is no doubt relying on the following general principle: "Where a debtor has established an entitlement to a homestead exemption to the extent of the larger rural measure, his claim cannot be defeated by the later acts of other persons in laying out and platting adjoining lands." *In re Becker*, 212 B.R. at 324 (citing *Baldwin v. Robinson*, 39 Minn. 244, 39 N.W. 321, 323 (1888)). Indeed, a permutation of this concept is codified in § 510.03 of the Minnesota Statutes. *See* Minn.Stat. Ann. § 510.03 (West 2000) ("As against debts which are not a lien upon such property the area of the homestead shall not be reduced or enlarged by reason of any change in the population of the place in which it is situated, by extending the limits of an incorporated place so as to include

the same or by the platting of surrounding or adjoining lands or the vacation of existing plats.").

Debtor's reliance on this principle is, however, misplaced. Debtor's lots have never been "rural" or used for agricultural purposes. This is not an instance of city development butting up against a decades old family farm; this is an instance of Debtor building a house on a sizeable lot in the outer suburbs and, almost as an afterthought, deciding to take up small-scale hobby farming operations.

Turning to the particular use of Debtor's two lots, this case is unlike others in which the debtors are clearly family farmers who live and work on the land and use it for agricultural purposes. *Cf. In re Becker,* 212 B.R. 322, 325–26 (Bankr.D.Minn.1997) (finding debtors who had farmed for three-plus decades a fifty-eight acre parcel which contained a barn and several outbuildings were entitled to larger homestead exemption). While Debtor testified that she and her family always wanted to farm, nothing in this record shows that they have farmed or are farming. Debtor and, to a lesser extent, her spouse have always been principally employed off the "farm." Moreover, what little "farming" they have engaged in-a fish farm in Wisconsin, one year's worth of failed mushrooms, and upstart wood-cultivated ginseng operations-is not farming in the traditional sense, was, and is, small-scale, and undertaken even as they maintained outside employment. These farming operations have never provided support for Debtor and her family but instead have merely given them healthy tax write-offs year after year.

Ginseng "farming," which can be done on small plots of wooded property, can be conducted with little or no land. In five years, Debtor and her spouse have planted less than one-half of an acre of land and never expect to harvest more than one-tenth of an acre of crop per year. Debtor and her spouse do not, and never will in their lifetime, need such expansive acreage for their operations even if they stay with wood-cultivated ginseng. What they do can be termed "farming," but it is clearly not agricultural as that term is traditionally understood and is not the sort of "farm" the homestead exemption statute was designed to protect. *See In re Johnson,* 69 B.R. 988, 995 (Bankr.D.Minn.1987) (suggesting that 1986 amendment which increased homestead exemption to 160 acres was intended to protect traditional family farms and "to address an existing and deepening crisis in rural Minnesota").

Debtor and her spouse fervently testified that they are ginseng farmers, but in actuality, they are a couple who own a very large house on a very large lot, which is virtually surrounded by other very large houses on very large lots, or, in a few instances, some smaller houses on sizeable vacant lots, in the country. Debtor has a full-time day job and spends her evenings and weekends pulling weeds and tending small plots of ginseng, akin to a city resident who maintains a backyard vegetable garden. Her spouse likewise has historically had a full-time day job, usually as an electrical contractor, with his various "farming" operations being secondary or on the side. Debtor and her spouse are not farming their parcels in any true sense, and there is nothing inherently agricultural about what they are doing. In short, ginseng "farming" is their hobby. Therefore, given the conclusively urban use and nature of Debtor's two contiguous parcels, Debtor is only entitled to a homestead exemption of one-half of an acre up to $200,000.

ACCORDINGLY, IT IS HEREBY ORDERED THAT the Trustee's Objection to

Claimed Exempt Property as to Debtor's homestead exemption is SUSTAINED.