**In re Dorcey David ENGSTROM and Elizabeth Ann Engstrom, Debtors.**

**Bankruptcy No. 05–39536.**

United States Bankruptcy Court, D. Minnesota.

June 20, 2007.

Randall S. Johnson, Attorney at Law, St. Paul, MN, for Debtors.

## ORDER OVERRULING OBJECTION OF CREDITOR ERIN FEEHAN-NELSON TO DEBTORS' CLAIM OF HOMESTEAD EXEMPTION

GREGORY F. KISHEL, Chief Bankruptcy Judge.

This Chapter 7 case came on before the Court on the objection of Erin Feehan–

Nelson, a scheduled creditor, to the Debtors' claim of homestead exemption. The objector appeared by her attorney, Chad C. Alexander. The Debtors appeared by their attorney, Randall S. Johnson. The following order memorializes the disposition of the issues presented, based upon the written objection, the Debtors' response, exhibits received at the hearing, other relevant filed documents, and the arguments of counsel.

## NATURE OF PROCEEDING AT BAR

The Debtors filed a voluntary petition under Chapter 7 on October 14, 2005. On their Schedule A, for "Real Property," they noted an interest in property they described as "Debtors' homestead located at 14805 45th Street S, Afton, MN 55001." They assigned a value of $407,000.00 to this property, noting an "Amount of Secured Claim" at $270,960.19. In their original Schedule C the Debtors claimed an exemption for their interest in this real estate, under the homestead provisions of Minnesota state law, Minn.Stat. §§ 510.01–.02.[1] They assigned a value of $136,039.81 as the "Value of Claimed Exemption."

Erin Feehan–Nelson, a scheduled unsecured creditor, timely filed an objection to the Debtors' claim of homestead exemption. She maintains that the size of the parcel of real estate in question exceeds that protectable under Minnesota statute, given the location and characteristics of the property. She then argues that a partition of the acreage between exempt and non-exempt portions would unreasonably affect the value of the non-exempt portion that would be liquidated by the trustee. Thus, she requests a directive to the trustee to sell the real estate as a whole, with the proceeds to be apportioned between the Debtors and the bankruptcy estate.

In response, the Debtors argue that the characteristics of the property entitle them to the larger of the two acreage limitations for homestead protection available under Minnesota law, sheltering it to the extent of its full area. Then, they maintain, because their equity in the real estate does not exceed the value limitation of the statute, their full interest in the property is exempt.

## FINDINGS OF FACT[2]

1. The real estate in question is a parcel of 4.7 acres in area, on which the Debtors' house is located.

2. The real estate is located within the limits of the City of Afton, Minnesota, in Washington County.

3. Debtor Dorcey David Engstrom purchased the real estate itself in 1967. The Debtors constructed the house on it in 1986. With their 16–year–old son, they resided in the house on the real estate as their dwelling place, on the date they filed their bankruptcy petition.

4. The real estate is approximately two miles from the boundary of the "Old Village" of Afton, that portion of the city that was first platted in 1855 into lots of a size appropriate to the higher-density residential and commercial uses of a mid–19th century Midwestern small town.

1. After this matter was submitted, the Debtors filed an amended Schedule C. Its amendments did not affect the claim of homestead exemption at issue here.

2. This section contains a number of fact-findings, going mainly to simple matters of geography, but it does not recite all of the facts relevant to the analysis. Other subsidiary findings are included in the "Discussion" section. This first section does include the key finding, however.

5. The Debtors' five-acre lot is one of a group of eight contiguous lots of the same size and proportions, arranged in two north-to-south rows of four each.

6. The Debtors' five-acre lot is legally described by survey, not by reference to a plat.

7. The eight-lot grouping that includes the Debtors' lot is immediately bordered on all sides by individually-owned tracts of land of around fifteen to thirty acres in size, with the exception of a subdivided parcel named "Collin Green Addition" on the Northeast. Collin Green Addition is approximately forty acres in size. It has been subdivided into eight lots. A single residential structure with outbuilding(s) is located on each such lot in this addition.

8. Several dozen lots of five acres in size, clustered similarly to the Debtors', are present within the city limits of Afton, in unplatted groupings of two up to twelve lots each. Most of them are located in an arc of 1.5 to 2.5 miles out from the Debtors' lot. They extend from one located due east of the Debtors' lot toward one located to the north-northwest of the Debtors' lot. Between all of these small clusters of five-acre lots are individually-owned tracts varying in size from around ten acres up to about eighty acres. This pattern of small groupings of smaller lots of five to ten acres each, surrounded by larger tracts, is present throughout the area of the City of Afton, with the exception of the Old Village and a half-dozen areas that apparently were subdivided and platted. One such subdivided area is called "Remus Addition"; it lies about one-half mile to the east-southeast of the Debtors' lot. Immediately to the west of the Old Village, but at least two miles to the northeast of the Debtors' lot is a large area, labeled "County Auditor's Plat # 5," with its southerly portion labeled "Valliswood." Immediately adjacent to that and to its west are two smaller such areas, both apparently subdivided, which are titled "Afton Highlands" and "Clover Estates." To the west of that, but one-half mile away and separated by a half-dozen larger individually-owned tracts, is another subdivision labeled "Meadow Ridge."

9. The land occupied by the Debtors as their residence is not included in the laid out or platted portion of the city in which it is located.

10. When the Debtors commenced this case, the value of their real estate was $407,000.00; a mortgage was attached to the real estate, to secure debt then of a balance of $270,960.19; and the Debtors thus held an interest in the land, or equity, of a value of $136,039.81.

11. In the months immediately before their bankruptcy filing, the Debtors raised 20–odd chickens on the real estate, to produce eggs for their own home consumption. They also maintained one beehive. They did not carry on any cultivation of row crops or husbandry of livestock on the real estate. The Debtors admit that, as a matter of fact, they are not engaged in farming as an occupation; both carry on employment or business away from their home place.

## CONCLUSIONS OF LAW

1. The area of the land occupied by the Debtors as their residence does not exceed the acreage limitation of Minn.Stat. § 510.02.

2. As of the commencement of this case, value of the Debtors' interest in the land that they claimed exempt did not exceed $200,000.00.

3. As a result, the land occupied by the Debtors as their residence qualifies as a homestead exempt under Minn.Stat. § 510.01.

4. As such, that land is exempt from the estate in this case by operation of 11 U.S.C. § 522(b)(2)(A), and it is not subject to administration by the trustee via apportionment, sale, or any other means.

## DISCUSSION

In Minnesota, the creation of a statutory exemption from claims of creditors for real estate used as a homestead is authorized by Article I, Sec. 12 of the State Constitution. *Kipp v. Sweno*, 683 N.W.2d 259, 262 (Minn.2004); *In re Haggerty*, 448 N.W.2d 363, 364 (Minn.1989); *Barton v. Drake*, 21 Minn. 299, 302 (1875); *Cogel v. Mickow*, 11 Minn. 475 (Gil. 354) (1866). Minn.Stat. Chap. 510 sets forth the homestead exemption. It begins with a definition that reads, in pertinent part:

> The house owned and occupied by a debtor as the debtor's dwelling place, together with the land upon which it is situated to the amount of area and value hereinafter limited and defined, shall constitute the homestead of such debtor and the debtor's family, and be exempt from seizure or sale under legal process on account of any debt not lawfully charged thereon in writing, except such as are incurred for work or materials furnished in the construction, repair, or improvement of such homestead, or for

services performed by laborers or servants and as is provided in section 550.175.

Minn.Stat. § 510.01. More relevant to the dispute at bar is "how limited," by "[a]rea and value," is that exemption:

> The homestead may include any quantity of land not exceeding 160 acres, and not included in the laid out or platted portion of any city. If the homestead is within the laid out or platted portion of a city, its area must not exceed one-half of an acre. The value of the homestead exemption, whether the exemption is claimed jointly or individually, may not exceed $200,000 or, if the homestead is used primarily for agricultural purposes, $500,000 exclusive of the limitations set forth in section 510.05.

Minn. Stat § 510.02.[3]

This objection to the Debtors' claim of homestead exemption focuses entirely on the first two sentences of Minn.Stat. § 510.02. The first issue raised by the objector is, which of the two levels of statutory limitation on the size of an exempt homestead applies to the Debtors' residential real estate. This will turn on whether that real estate is "included in the laid out or platted portion" of Afton, the city in which it is located.[4] This is an issue

---

**3.** The two quoted phrases are from the title of this section. The quoted text is from the statute in effect in October 14, 2005, which is the law that 11 U.S.C. § 522(b)(2)(A) imposes on this case, the "State ... law that is applicable on the date of the filing of [the debtor's] petition ..." All further references will signify that statutory text, and none other. *See* n. 12 *infra.*

**4.** In her counsel's written submissions, the objector raised no contention with the value that the Debtors had assigned to the property, the amount of the debt chargeable against it via mortgage, or the resultant "equity" that is the component of value to which the homestead exemption is to apply. *See Baumann v.*

*Chaska Bldg. Ctr., Inc.,* 621 N.W.2d 795, 799 (Minn.Ct.App.2001); *Kipp v. Sweno,* 629 N.W.2d 468, 473 (Minn.Ct.App.2001). Thus, that aspect of the statute's requirements is settled by the effect to be given to these recitations on the Debtors' Schedule C. *See* 11 U.S.C. § 522(*l*) ("Unless a party in interest objects, the property claimed as exempt on [a debtor's Schedule C] is exempt."); Fed. R. Bankr.P. 4003(c) (party objecting to debtor's claim of exemptions "has the burden of proving that the exemptions are not properly claimed"); *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643–644, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *In re Peterson,* 929 F.2d 385 (8th Cir.1991); *Gagne v. Bergquist,* 179 B.R. 884, 885 (D.Minn.1994).

of fact. *Nat'l Bank of the Republic of New York v. Banholzer,* 69 Minn. 24, 71 N.W. 919, 920–921 (1897).

As originally presented, this seemed to pose a confounding dilemma. The objector's counsel had peppered his briefs and arguments with citations to the transcript of the Rule 2004 examination of the Debtors; plat mats; zoning maps, municipal comprehensive plans, and land use ordinances; statements on valuation from the Washington County Assessor; and case law citations state and federal. From this he constructed a dense, detailed, and rapid-fire theory of objection: that the Debtors' lot and home were smack in the middle of "an upscale suburban residential neighborhood," an upper-crust exurban compound of sorts, where citified residents fleeing the less pleasing aspects of the metropolitan environment were playing at being "rural." Layered over this was an insinuation that the size of the lot alone was so much more than anyone reasonably needed for residential purposes without the involvement of farming, that the real estate simply had to fail muster for the homestead exemption.

Even discounting this onslaught by the measure of its stridency, it could not be rejected out of hand. Some of the cited characteristics arguably made the land "on the border line between the rural and urban portions of the city," *Banholzer,* 71 N.W. at 920–921, which then would require the analysis under that opinion.

Nonetheless, the objector's position was troubling, both directly and by extension. With the material that the Debtors used to round out the evidentiary record—photographs and other documents—there are significant indicia of a rural character for the property and its surroundings. These include gravel roads, plowed strips of cropland, and open and undeveloped spaces. This cut very much against the objector's counsel's verbalization of a toney enclave with tamed-down foliage and recently-constructed mini-mansions. But taking it back around were disturbing parts of the bigger picture—many traditionally-sized farms within Afton had clearly been broken up by the creation of new residential aggregations, driven by a demand among upper-income people for isolated, quiet living that nonetheless would be within an easy commute of the Twin Cities' downtowns and all of their urban amenities. And this five-acre lot (obviously sized to satisfy a city ordinance prescribing minimum residential lot area so as to preserve a dispersed rural "feel") was nonetheless one of several such lots that were contiguous in their own grouping, among many small clusters of such lots within a several-mile radius.

This all raised the possibility that some further evidence was necessary, beyond the documentary exhibits and photographs filed to support the objection and response. Yet, there was the sense at the close of argument that a threshold issue, elusive in its precise nature, was somewhere in there, and required a ruling before evidence should be received.

On a more thorough review of the record and some contemplation, it turns out that the evidence submitted to date, entirely in written form, is sufficient to support findings on the ultimate issue under the governing law.

The rule of decision lies in the *Banholzer* opinion. Though it is now 110 years old, *Banholzer* is recognized as the "most recent in-depth pronouncement on the construction of" the first two sentences of Minn.Stat. § 510.02, from the state-court forum with the unquestioned power to make binding precedent. *In re Becker,* 215 B.R. 585, 586 (8th Cir. BAP 1998). *Banholzer* addressed the specific issue presented here, whether a parcel of real

estate within the geographic boundaries of a city, occupied by a debtor as a residence, of an area greater than the lesser acreage limitation under the applicable statute, was outside "the laid out or platted portion" of that city so as to merit the larger acreage limitation.

In *Banholzer*, the Minnesota Supreme Court affirmed the trial court's finding that a five-acre tract of land "within the corporate limits of the city of St. Paul," "on the north bank of the Mississippi river 2 1/2 or 3 miles west of the Wabasha street bridge," was not within the laid out or platted portion of St. Paul. The trial and appellate courts in *Banholzer* reached this conclusion, despite several factors that suggested a contrary result. First, an industrial installation was located on the property, in addition to the judgment debtor's residence house.[5] Second, the land surrounding the subject was all platted, with the exception of several small tracts. And last, there was "a very considerable number of houses for three blocks west and four blocks north of this five-acre tract ... and railroad car shops to the northeast." 71 N.W. at 920. For the *Banholzer* court's affirmance, the turning point was that it did "not appear that there [was] anything else urban in character for miles around," and that the tract was "2 1/2 or 3 miles from the business center of the city." *Id.*

■■■■ The components of *Banholzer's* legal rationale are gleaned from its extended, evocative, and reasonably clear discussion:

1. In the first instance, the focus of the statute is on the "portion" of the city in which the subject real estate lies, and not on the subject real estate itself. 71 N.W. at 920. *See also In*

*re Becker*, 215 B.R. at 587 (analyzing *Banholzer* ).

2. A "laid out or platted" portion of a city is "that platted, general, or grand division of the city which is urban in its character ..." 71 N.W. at 920.

3. For the application of the statute, there is "but one platted portion of the city, not several; and all such unplatted pieces or remnants *lying in such portion* are included within it." *Id.* (emphasis added).

4. One looks, "generally," to the "urban ... character" of the "portion" of the city adjacent to the subject, as well as the status of the larger area as formally platted or informally "laid out," to characterize the surrounding portion of the city. *Id.*

5. And, "finally[,] ... the distinction between rural and urban [is] the controlling principle by which to determine the area or size of the homestead"; "the mere matter of platting within the corporate limits is not controlling." 71 N.W. at 919.

When this is applied to the facts at bar, some ambiguities and imponderables spring up. At this remove from *Banholzer's* time, this is inevitable; the case law relies on an articulated dichotomy between the concepts of "urban" and "rural" that was rooted in past historical context, but large changes in local land-use practices have taken place since then. In the end, though, there is enough flexibility in the formulation to allow for the recognition of more modern circumstances. Once one does that, one pronouncement should be made right away: for the purposes of this statute, "rural" as a conceptual character-

---

5. The industrial facility consisted of "a brewery, boiler house, ice house, store house, sta- ble, [and] carriage house." 71 N.W. at 919.

ization need not be lockstepped with "agricultural." Eschewing that equation will not create an unjust windfall for debtors, out of conformity with the intent of the statute.

■ So the characterization of the land surrounding the Debtors' lot is the first step in the analysis; and, under *Becker's* reading of *Banholzer*, absent equipoise in the characterization between "rural" and "urban," that point will be dispositive. *In re Becker*, 215 B.R. at 587.

■ Here, one part of the City of Afton clearly is platted or laid out, the Old Village. For a century and a half, that portion of Afton has been subdivided for higher-density residential and commercial uses. Both the layout of the surface alterations—roads, streets, utility corridors, etc.—and the long-time uses of the altered terrain are properly considered "urban" in *Banholzer's* sense.

Out from that, a good portion of the lands contiguous with the Old Village could likewise be considered "urban" in their legal status of subdivision, their physical exploitation, and their practical use: the larger tracts denominated "Sunrise Hills," "Afton Highlands," "County Auditor's Plat #5," "Valliswood," "Clover Estates," and "Croixdale" in the 2004 Plat Book Map of Afton.[6] These areas are legally "platted," fitting right under the statute's term of art; so they and the larger undivided tracts between them could also properly be considered "the laid out or platted portion" of Afton under *Banholzer's* construction of the statute. Obviously, usage of somewhat higher in a comprehensive geopolitical layout is occurring there, or is in the process

of realization. That density is only relative, as the lots apparently must be of the five-acre minimum size, but once these subdivisions are fully developed there will be wide expanses of single-use residential tracts, in plats dedicated to that purpose, in this first ring out from the Old Village. Under the thrust of *Banholzer's* logic, that looks and feels more like "town" than "country"—regardless of any homeowners' pretensions at being latter-day rural manor-holders.

But what is beyond that? It is the interspersion of groupings of five-acre lots established by survey but not by full-fledged plat. In a connotative sense, these lots and their groupings are "laid out," in regular but small rectangular grids; but invariably there are limited numbers of single lots within each grouping. And separating all these groupings are larger, undivided tracts of land still in individual ownership, of areas of a quarter-quarter section on up to a quarter-section. Large swaths of the land in this larger ring are now zoned "Residential" or "Rural Residential," including the lot-grouping that includes the Debtors' homeplace (and necessarily the Debtors' homeplace itself). But roughly the westerly forty percent of the area of the City of Afton is zoned "Agricultural," "Agricultural Preservation," or "Conservancy," including much of the ring of interspersed larger tracts and smaller groupings of lots next out from the ring of the subject. A tendril of this area, which obviously is "rural" under *Banholzer*, goes right into the acreage immediately to the west of the Debtors' lot.[7]

---

6. But even here there is an exception or two, the larger tracts owned by William and Anna Dieperink (43.4 acres), Parsons Farm, LLC (40 acres), and D. and E. Berglund (22.5 acres), which lie between these large subdivided and developed or developing areas.

7. In oral argument the objector's counsel denied this; but that is what the zoning map—his own exhibit—shows.

The objector produced no evidence at all that any of the lands outside the Old Village and the inner ring of formal subdivisions was now being exploited for any residentially- or economically-intensive purpose over wider expanses, via a systematic and organized alteration of the topography or the construction of more or larger buildings and improvements in greater numbers and density. The objector's counsel dwelled in argument on the fact that there are several large, recently-built houses within a half-mile of the Debtors' lot.[8] But so what? At least for those of some means, albeit a stilted frame of reference, that too can be "life in the country" in a latter-day sense.[9]

If anything, the development, use, and physical characteristics of the area surrounding the Debtors' homeplace, in a long arc nearly two miles in radius, are far less urban in nature than those presented in *Banholzer*. There is nothing more than houses in an interspersed pattern of low to very low density, with some agricultural use (pasture, meadow, and some cultivation of cropland) likely taking place a half-mile or more to the west.

There are no beer-producing or railroad maintenance facilities, and there is not a "very considerable number of houses" close by.[10] The presence of those circumstances did not prevent the original finding of fact that the subject in *Banholzer* was not within the platted or laid out portion of St. Paul. Nor did it deter the appellate affirmance of that finding. The fact of the subject in *Banholzer* being a manageable wagon ride from the built-up center of a smaller but bustling state capital did not prevent the finding or its affirmance, either. By contrast, the subject here is a like number of miles from the center of an old and small river village that is self-consciously trying to maintain quaintness, quiet, and a bucolic atmosphere (and is succeeding, at least, in keeping local population density relatively low).

The land that included the residence of the judgment debtors in *Banholzer* was held not to be within an urban orbit.

---

**8.** This finding is generous to the objector. Her counsel relied exclusively on high-altitude topographical photos to support his observations of the presence of these structures. His Exhibits P1 and P2 show the presence of no more than two of these each, on longish private gravel roads coming off 45th Street South and Trading Post Trail South. The only ground-level photographs in the record are those taken by the Debtors, originally at the trustee's request. Those show winding gravel roads, some strips of plowed cropland, open fields, deciduous forests, and a few outbuildings. The representation is that these were shot in all four directions from the boundaries of the Debtors' lot. If they presented a stacked and inaccurate view, the objector's counsel had opportunity to rebut it by producing similar evidence. In fact, that should have been done as part of the objector's initial submission. Neither then nor later did the objector make any photographic showing of less countrified and more essentially "urban" surroundings, on the human scale of ground level. Her aerial photos sure show an awful lot of trees—but no more than ten or a dozen buildings in total on either one.

**9.** And if one or more "McMansions" have sprung up in the vicinity of the Debtors' homeplace in recent years, at the instance of persons not under the Debtors' control, that cannot be a factor to support a reduction in the geographic extent of the Debtors' homestead entitlement if the Debtors were there before. Minn.Stat. § 510.03 (area of land protected as debtor's homestead "shall not be reduced or enlarged by reason of any change in the population of the place in which it is located ..." that took place after debtor occupied property).

**10.** *Banholzer's* description of the nearby collection of houses evokes the image of a block or two of regular, developed rectangular lots with right-angled streets and alleys, very much in the mode of small towns and cities alike in the 1890s.

There is far less warrant to rule against the Debtors here on that account. There is no fair or principled way to classify the surrounding area as a "suburban residential neighborhood," connotatively or denotatively, which of necessity would be a "laid out portion" of Afton. The size of the Debtors' lot may be larger than absolutely necessary in a physical sense, for the footprint of a house and associated structures. But that does not matter. The objector's counsel's insinuation that the Debtors were acting underhandedly to preserve some sort of privileged position is class-based rhetoric, really nothing more than elitism in reverse, an argument not to be countenanced under Minnesota homestead jurisprudence. *See Kipp v. Sweno*, 683 N.W.2d at 267 (quoting *Thiede v. Town of Scandia Valley*, 217 Minn. 218, 14 N.W.2d 400, 405 (1944), to note longstanding "general proposition" of Minnesota law to protect statutory right of occupancy of homestead, "irrespective of the meagerness or abundance of [the debtor's] wealth . . .").

Under the caselaw this ends the analysis and dictates a ruling for the Debtors—both under *Banholzer's* precedent and through *Becker's* more strongly-chiseled interposition of a sequential analysis.[11] And, ultimately there is nothing unlawful, unjust, or even untoward, in allowing the Debtors to retain the possession of their homeplace of two decades, as well as the economic value of their interest in it. The economic value falls well below the limitation of $200,000.00 established by the Minnesota State Legislature in 1993. Given recent years' rampant inflation in real estate values in the Twin Cities, that amount does not protect that much of a house in most parts of the metropolitan area. The statutory limitation on value is necessarily seen as the reflection of a legislative judgment, as to a fair balance between debtors' protections and creditors' rights to realization on their claims, the protection of a relatively modest homeplace coupled with the avoidance of excess. Given the Debtors' entitlement to the larger acreage limitation, allowing them their homestead exemption as claimed certainly does not upset that balance.[12]

11. Thus, the Debtors' admission that they are not to be considered as "farming" their land does not hurt them, because the nature of their land itself and their use of it need not be examined for the purposes of the acreage limitation. Their usage would be relevant to the statute's *value* limitation; but because the Debtors' equity falls below the lesser limitation for homesteads under non-agricultural uses this is not an issue either.

12. Two closing observations, not outcome-affecting but worth making: First, the objector heavily relied on *In re Kyllonen*, 264 B.R. 17 (Bankr.D.Minn.2001). The analysis here arguably departs from that in *Kyllonen*, and the outcome is certainly opposite. This is due to a different "take" on *Banholzer* and *Becker*; and as such, so be it. This decision and *Kyllonen* are the products of coequal judges on a trial court, neither bound by the interpretation of law made by the other. *Banholzer* is surprisingly "modern" in the length and relative clarity of its discussion; but, as often is the case with well-meaning pronouncements of appellate courts, the edges of its conceptual structure are not always clear-cut. As binding precedent, it must be made to work in conditions different from those that generated it. The appellate decision in *Becker* was an effort toward that, and *Kyllonen* followed on that; but going back to first principles, *Banholzer* itself does not mandate the equation of agricultural *use*, with rural *character*. (The facts in *Banholzer* certainly cut right against that.) Second, while this decision was in preparation the Minnesota Legislature enacted a historic amendment of Minn. Stat. § 510.02. *See* 2007 Minn. Laws Ch. 105, Sec. 2. Among other things, this legislation did away with the bifurcated acreage limitation of the longstanding prior law, abrogating the distinction between rural and urban land under claim of homestead exemption. Now there is one acreage limitation, 160 acres; and the avoidance of excess is now to be accomplished by the value limitation, increased to $300,000.00 for land not "used

## ORDER

IT IS THEREFORE ORDERED:

1. The objection of Erin Feehan–Nelson to the Debtors' claim of homestead exemption is overruled.

2. The Debtors' claim of homestead exemption, as set forth in their original Schedule C and as reprised verbatim in their amended Schedule C, is allowed.

primarily for agricultural purposes," which henceforth will be adjusted for increases in the cost of living as are Minnesota's other exemption statutes. This amendment is not effective until August 1, 2007. Minn.Stat. § 645.02. Thus, this historic amendment has no bearing on this case; but its enactment does leave the discussion in this decision with very limited future utility.